IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

PABLO CAMANEY ARZATE, a.k.a.
Albear Garcia Camerino, a.k.a. Moises
Fernandez, a.k.a. Pelon,

Defendant.

CRIMINAL ACTION NO.
1:12-CR-329-TCB-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This case is before the court on Defendant Pablo Camaney Arzate's Motion to Suppress Statements of Defendant, Motion to Suppress Evidence, Supplemental Submission Regarding Motion Challenging Identity, and Motion for Dismissal Based on Incorrect Identity of the Defendant. (Docs. 38, 39, 77, 105). For the reasons that follow, this Court **RECOMMENDS** that Defendant's Motions be **DENIED**. Docket Entries [38, 39, 77, 105].

## DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE

On September 25, 2012, the grand jury charged Defendant Albear Garcia Camerino with (1) possession with intent to distribute, aided and abetted by others, and conspiracy in order to possess and distribute methamphetamine in violation of 21 U.S.C.

§§ 841(a)(1), 841(b)(1)(A)(ii) and (viii), 846, 18 U.S.C. § 2; and (2) knowingly possessing a firearm in furtherance of a drug trafficking crime, aided and abetted by others, in violation of 18 U.S.C. § 924(c)(1)(A)(i). Docket Entry [1]. After Defendant filed a motion contending that he was not Albear Camerino and that his true identity is Pablo Camaney Arzate, the Government obtained a Superceding Indictment charging Pablo Camaney Arzate, a/k/a Albear Garcia Camerino, with the same violations as previously charged against Albear Camerino. Docket Entry [78].

Defendant Arzate contends that evidence[1] seized during a protective sweep of an apartment in which he was an occasional overnight guest and where he stored his passport, some photographs, and a cell phone, should be suppressed because the search was not consensual and a protective sweep was not justified. In addition, Defendant contends that evidence obtained pursuant to a search warrant of the residence should be suppressed as well because the probable cause for the warrant solely consisted of evidence gained from the initial illegal entry. Defendant Arzate also contends that statements he made to Drug Enforcement Agency agents during an interview while he was in handcuffs and being held at immigration facilities should be suppressed because his statements were elicited before the agents gave him <u>Miranda</u> warnings. Defendant further contends that his statements should be suppressed because he was coerced by the agents' threats that he was facing "a real prospect of not seeing his family for twenty

---

[1] Defendant contends that during the search of the apartment, law enforcement agents seized a passport, identification, methamphetamine, cocaine, and weapons. (Apr. 1, 2013 Hearing Transcript 4, 35).

2

years." Defendant argues the indictment against him should be dismissed because the Government cannot show that he was the same individual to whom a law enforcement officer spoke to outside of the apartment while other law enforcement officers were searching the apartment.

## I.   FACTUAL BACKGROUND

### A.   The DEA Task Force Searches Apartment L-8

Special Agent Keith Cromer ("SA Cromer"), who has been a Special Agent with the Drug Enforcement Agency ("DEA") since 1999 and the Group Supervisor assigned to DEA Task Force Group Two, was part of an investigation of a Mexico-based drug trafficking organization that began in 2011. (Transcript of Apr. 13, 2013 Hrg., hereinafter "Tr.," 7, 9). As part of that investigation, on August 23, 2011, SA Cromer, DEA Special Agent David Aguilar ("SA Aguilar") who is employed with the Norcross Police Department and assigned to the DEA's Task Force Group Two, as well as other agents conducted a "knock and talk" at an upstairs apartment (apartment L-8) on Peachtree Industrial Boulevard in Doraville, Georgia. (Tr. 8-9, 91). SA Cromer explained that a "knock and talk" occurs when law enforcement officers go to a location where they believe that drug trafficking activity is occurring without probable cause to obtain a search warrant, knock on the door, identify themselves to the person who answers, and try to elicit the cooperation of that individual. (Tr. 10). At the time, law enforcement agents believed they had seen Defendant, who they previously identified as Albear Camerino, coming and going from the apartment. (Tr. 8).

3

Four agents, clad in vests that clearly identified themselves as police and DEA agents, approached the apartment door, and SA Aguilar knocked on the door. (Tr. 11, 36, 94). No one answered the door for five minutes, but agents creating a perimeter around the apartment observed a man walk onto the balcony outside of apartment L-8. (Tr. 95). The agents outside instructed the man to go to the front door. (Tr. 95). The young male, who appeared to be nineteen years old, later identified as Carlos Arevelo, answered the door. (Tr. 11, 36, 95). SA Aguilar, who speaks fluent Spanish, spoke for the Agents and asked Arevelo in Spanish whether there were any other people or any weapons in the apartment. (Tr. 92, 95-96). At the time, the agents had not drawn their weapons. (Tr. 111-12). Arevelo, speaking in English, invited the law enforcement officers inside. (Tr. 95-96). SA Aguilar testified that immediately as they entered the apartment, they noticed contraband, guns, weapons, money, and drugs in plain view. (Tr. 96). SA Aguilar testified that upon seeing the guns, he drew his weapon. (Tr. 96). Additionally, four or five law enforcement officers then performed a security sweep of the apartment. (Tr. 96, 111). During the security sweep, the law enforcement officers viewed weapons, guns, and money in plain view, but learned there was no one else in the apartment. (Tr. 96).

SA Cromer's account of the entry and search of the apartment differed from that of SA Aguilar. According to SA Cromer, SA Aguilar asked Arevelo for consent to search the apartment, and Arevelo assented. (Tr. 13, 32). SA Cromer states that he does not recall whether SA Aguilar asked for consent in English or Spanish. Additionally,

4

when SA Cromer was asked whether he was present at the time consent was given, SA Cromer said that he was present, but that he did not pay attention to SA Aguilar and the young man's interaction initially. (Tr. 32). SA Cromer states that he did not hear the conversation in which the young man lent his consent. (Tr. 33). SA Cromer testified consistent with SA Aguilar that once inside the apartment, agents performed a protective sweep. (Tr. 13). SA Cromer stated that the agents wanted to make sure there was no one else in the apartment. (Tr. 13).

Another officer, Sergeant T.P. Donahue from the DeKalb County Police Department, who was not present during the agents' initial entry into Apartment L-8, testified that when he arrived at Apartment L-8, he was informed that consent had been given to go into the apartment, and once law enforcement agents were inside the apartment, a quantity of illegal narcotics were observed. (Tr. 64). Sergeant Donahue also testified that on a later date, when he was chit chatting with Arevelo before Arevelo was taken to his Preliminary Hearing, Arevelo indicated to him that he gave his consent for the search of the apartment. (Tr. 62, 64, 90).

SA Aguilar testified that after the security sweep, he spoke to Arevelo in Spanish and English and read Arevelo his <u>Miranda</u> warnings. (Tr. 96-97). Arevelo, whose English was very understandable, told SA Aguilar in English that he had recently graduated from Brookwood High School. (Tr. 97). SA Aguilar testified that he believes Arevelo also told him that he was nineteen years old. (Tr. 118). According to SA Cromer, Arevelo also advised the law enforcement agents that he was staying in the

5

apartment with his sister's boyfriend. (Tr. 11-12, 28, 37, 98, 118). According to SA Aguilar, Arevelo said that the person who lived in the apartment was a friend of his and that he had moved in that morning. (Tr. 11-12, 28, 37, 98, 118). Arevelo showed the agents a big bag with his personal hygiene items and clothing. (Tr. 98). Arevelo also advised agents that his sister's boyfriend was out walking the dog. (Tr. 12, 99, 109). Arevelo did not provide a name of the person walking the dog or point to a photograph of him. (Tr. 109). SA Cromer went down to the parking lot to see if other agents saw someone in the parking lot who was walking a dog. (Tr. 13). The other agents advised him that there was an individual who was walking a dog somewhere around the parking lot and was stopped and identified, but released. (Tr. 13, 29). Based on another agent's rendition of the probable cause up to the point of the search as well as what was observed in the apartment, a warrant was obtained from a magistrate judge. (Tr. 65). During the search of the apartment, agents found and photographed crystal methamphetamine, cocaine, large quantities of United States currency, a box for a money counter, a passport for Pablo Arzate, statuettes of Santa Muerte, and numerous firearms. (Tr. 14, 68-75). Agents also found a passport for Pablo Arzate. (Tr. 15).

SA Cromer testified that agents had previously taken surveillance photos of Arzate and had intended to talk to Arzate while at the apartment. (Tr. 15). SA Cromer believes Defendant is the individual identified as Arzate and states that agents previously conducted surveillance photos of Arzate going towards the side of the building where the apartment was located. (Tr. 17, 22-24). According to SA Cromer,

6

because Arzate's identification and other items were within the apartment, agents believed that they had confirmed that Arzate was living in the apartment. (Tr. 15).

## B. Officer Hooks Speaks with a Man Walking His Dog Outside the Apartment

Officer Tyler Hooks, who is an officer with the Rockdale County Sheriff's Office assigned to DEA Atlanta Task Force Group Two, waited outside the apartment's perimeter to make sure that the officers doing the knock and talk were safe and to make sure that no one ran from the apartment. (Tr. 43-45). When Hooks arrived at the scene, he observed a Hispanic male out walking two small dogs in the breezeway which led to apartment L-8. (Tr. 45-46, 48, 56). Hooks testified that he asked the male whether he possessed any identification and from what location he was coming. (Tr. 46). The man handed him a piece of identification that was green and had the word "Mexico" written on it. (Tr. 46). Hooks looked at the identification and the picture within the identification matched the appearance of the person to whom he was conversing. (Tr. 47). Hooks also wrote Albear Camerino, the name on the identification, and the birthday on a small piece of paper. (Tr. 47, 59). Hooks also states that he believes that the man told him that he was coming from apartment L-7, but cannot remember what words he used to do so. (Tr. 61). The man sat on the curb and waited while Hooks yelled to Agent Hewitt, who was fifty feet away, and asked her whether the man was "okay." (Tr. 49). According to Hooks, Agent Hewitt responded with a thumbs up sign, which Hooks interpreted to mean that the man was not involved and that it was okay for

7

Hooks to release the man and assist with the search of the apartment. (Tr. 49). Hooks later learned that the thumbs up sign was only meant to convey that everyone in the knock and talk was safe. (Tr. 50).

SA Cromer later asked Hooks where the Hispanic male went, but by that time the man was gone. (Tr. 50). SA Cromer and Hooks walked around the apartment complex looking for the man, but could not locate him. (Tr. 50). Hooks testified that he cannot definitively testify that he has seen the man again and that he cannot remember exactly what the man looked like. (Tr. 51). Hooks does not recall anything distinguishing about the man and does not recall if he had any tattoos. (Tr. 53).

### C. Defendant is Interviewed a Year Later

On August 16, 2012, SA Cromer, SA Aguilar, and Tony Smith participated in an interview of Defendant in an interview room at the DEA office. (Tr. 100, 119). At this point, Defendant had not been arrested and SA Aguilar contends that Defendant was not in custody of the officers. (Tr. 123-24). Although Defendant spoke English at the interview, SA Aguilar, who speaks fluent Spanish, was there to interpret if needed. (Tr. 92, 100). SA Aguilar testified that Defendant spoke English and appeared to understand English at times. (Tr. 101). SA Aguilar testified that he read Defendant his Miranda warnings from a card in Spanish while sitting next to him. (Tr. 120-21). SA Aguilar asked Defendant to read along with him and instructed Defendant to verbally indicate yes or no if Defendant understands him. (Tr. 121). When SA Aguilar was asked how Defendant responded after his rights were read to him, SA Aguilar stated, "He was fine.

8

He complied. We had a conversation. We spoke." (Tr. 122). No form was given to Defendant during the interview. (Tr. 213). SA Aguilar testified that he did not converse with Defendant about the amount of time Defendant was facing and does not recall any conversation whether other agents mentioned the length of jail time Defendant was possibly facing. (Tr. 123).

SA Aguilar testified that Defendant told him during the interview that Defendant was the person walking the dog on the day of the search of the apartment. (Tr. 102). SA Aguilar testified that Defendant told SA Aguilar that he left the apartment fifteen minutes prior to law enforcement's arrival that day and that he was encountered by the police, but the police let him go. (Tr. 102). According to SA Aguilar, Defendant also identified himself as Camaney Arzate and as the person who was living in the apartment with Arevelo. (Tr. 102). The conversation between Defendant and the DEA agents was not recorded and was not videotaped. (Tr. 119-20, 123-24).

### D. **Defendant's Version of Events**

#### 1. Defendant's Connection to Apartment L-8

Defendant argues apartment L-8 is not his apartment and that he was not the person walking the dogs who encountered Officer Hooks and gave him identification in the name of Albear Camerino on the day of the search. Defendant testified that his name is Pablo Camaney Arzate, that he has been in this country since 2001, and that the highest level of education he completed was the ninth grade while he was in Mexico. (Tr. 154, 159-60). Defendant testified that he entered the United States illegally by

9

using someone else's passport because his father told him that a local municipal policeman was making plans to have Defendant killed because the policeman did not like Defendant. (Transcript of Dec. 2, 2013 Hrg., hereinafter "Tr2," 15). Defendant testified that while he was in America, he used identification in the name Jose Luis Duque Gomez and obtained a birth certificate in that name while he was in California. (Tr2 16-17). According to Defendant, he then used the birth certificate to apply for a passport that he completed in the name of Jose Luis Duque Gomez and signed it in that name, with the intent to deceive the people who issued passports. (Tr2 17-18). Defendant also testified that he purchased a fake license in the name of Jose Luis Duque Gomez while he was in California. (Tr2 19-20). Defendant further testified that he assumed another identity of Moises Fernandez in California and obtained identification in that name. (Tr2 21).

Defendant testified that the passport recovered from the Apartment L-8, in the name of Pablo Camaney Arzate depicted in Government's Exhibit A3 was his passport. (Tr. 130; Tr2 9). Defendant also testified that he has a second passport in the name of Jose Luis Duque Gomez, but he does not have a passport issued in the name of Albear Camerino. (Tr2 9). Defendant further testified that he has never had identification in the name of Albear Camerino, that he has never given that name when he has been stopped by law enforcement, and that he has never used that name for any purpose. (Tr2 9-10, 14).

According to Defendant, after he had a fight with his girlfriend, he gave some

10

documents to Albear Camerino, who Defendants alleges was living in apartment L-8, so that Camerino could keep the documents for him because Defendant was afraid that his girlfriend would find out that he had another girlfriend, become angry, and would burn his documents. (Tr. 131, 141). Defendant testified that Camerino was born around 1992 but that he is seven years younger than Defendant, he did not have any tattoos, and he is between 5'9" and 6'. (Tr. 160; Tr2 10-11). Defendant also testified that Carlos Arevelo is the brother of one of Defendant's girlfriends and that Arevelo had moved in on the same day as the August 2011 search of the apartment. (Tr. 132, 144). Defendant further testified that he has never seen Officer Hooks, who encountered the man walking dogs during the search of apartment L-8, before the day of the suppression hearing. (Tr. 160; Tr2 10-11). Defendant testified that he does not know what work Camerino did for a living and does not recall his telephone number. (Tr2 37).

Defendant also testified that he does not live at apartment L-8, that he does not rent the apartment, but would sometimes spend the night there after he and Camerino would drink together after going to a Mexican nightclub. (Tr. 131, 141-42, 148, 154). Defendant testified that he had been to the apartment "constantly," that he sometimes visited the apartment L-8 during the day without spending the night, and the last day he stayed there was "like, two days before" the search of the apartment. (Tr. 131, 145-47). Defendant testified that he had been to apartment L-8 to visit Camerino at 4:00 on August 23, 2011, prior to the time that the search occurred and had left his phone charging in the living room of the apartment. (Tr2 32-34). Defendant also testified,

11

however, that he was not at apartment L-8 on August 23, 2011. (Tr. 132). Defendant testified that the only other items he had in the apartment were some photographs, depicted in Exhibits 39 - 43, that Arevelo's sister had given him and an iPhone. (Tr. 132-33). Defendant further testified that he actually lives in apartments near Highway 29 and Jimmy Carter Boulevard with his girlfriend and another couple. (Tr. 131-32). Defendant subsequently testified that he "lived at Peachtree Industrial," but corrected his testimony and said, "No, on Jimmy Carter in some apartments near Highway 29 and like close to a Home Depot." (Tr2 11). According to Defendant, he did not own any pets in August 2011, but that sometimes Camerino would allow him to take Camerino's little dog for a ride in Defendant's car, but that Defendant did not like to walk the dog. (Tr. 142).

Defendant subsequently testified that on the day of the search, he was at a Chevron gas station on Peachtree Industrial when he received a call from Camerino, asking him to make some purchases at a store in a shopping center near the entrance of the apartment building and to pick Camerino up there. (Tr2 12-13). Defendant states that when he picked up Camerino, Camerino was dressed in a muscle shirt and had a little dog in his hands. (Tr2 12-13, 26-27). According to Defendant, Camerino told Defendant that Camerino was out walking the dog when Camerino observed people with rifles exiting private cars and heading up to the apartment. (Tr2 13). Defendant testified that Camerino further told Defendant that Camerino was stopped by the law enforcement officers and Camerino told them that Camerino lived in Apartment L-7,

12

that Camerino's mother was out working, and that Camerino was taking the dog for a walk. (Tr2 13).

Defendant further testified that a family member of his who name was "Larry" has communicated with Camerino since Defendant has been in custody. (Tr. 161). When asked for Larry's last name, Defendant responded "Larry, Larry" and subsequently said Larry's last name was Navarro. (Tr. 162). Defendant testified that "Larry" lives in Anaheim, California, but Defendant does not have his telephone number or address. (Tr. 162). Defendant attempted to explain that the reason he did not have a telephone number or address for "Larry" was because he had changed phone numbers and that Defendant had not had any communication with Defendant's parents or "with anybody." (Tr. 163). Defendant states, however, that the reason he knows that Larry reached out to Camerino is because Larry told him on the telephone before February 13, 2013, when the United States Marshal instructed staff "to take away all [Defendant's] freedoms." (Tr. 163). Defendant further testified that he called Larry, but that he did not "write down the phone numbers or the phone calls that [Defendant] made." (Tr. 163-64). When asked how Defendant was related to "Larry," Defendant testified that he has known Larry ever since Defendant came to the United States. (Tr. 164). When the Court stated, "So he's not a relative," Defendant replied, "Well, we became relatives." (Tr. 164).

### 2.    The August 16, 2012 Interview

According to Defendant on August 5, 2012, he was arrested by officers who took

13

him to the DeKalb County jail for driving without a license and two other charges. (Tr. 133-34). Defendant testified that on August 16, 2012, officers from Immigration came to pick him up from the DeKalb County Jail and transported him to an Immigration and Customs Enforcement office. (Tr. 135). After ICE officers questioned Defendant, at some point he was taken to the DEA office, placed in handcuffs, and questioned by DEA agents. (Tr. 135-36, 152). Defendant also states that at some point, one of the DEA agents, he does not remember who, told him that he was under arrest for trafficking substances. (Tr. 151). According to Defendant, SA Aguilar started asking him about thirty or forty questions prior to reading him his <u>Miranda</u> warnings. (Tr. 137, 150-51). Defendant states that he felt that he was being threatened because SA Aguilar told him he would not see his children for twenty years because he would be in jail and that Defendant had to cooperate with the law enforcement officers. (Tr. 138). Defendant testified that when SA Aguilar finally read the <u>Miranda</u> warnings, SA Aguilar did not read Defendant his rights one by one or ask if Defendant individually understood each right. (Tr. 150). Instead, Defendant alleges SA Aguilar read Defendant his Miranda rights straight through and asked Defendant if he understood them.   (Tr. 150). Defendant states that he replied, "More or less." (Tr. 150). Defendant testified that he never admitted to DEA agents that he was walking the dogs on August 23, 2011, or that he had sold drugs. (Tr. 154-55). Defendant also testified that the agents never asked him whether he was outside walking dogs on August 23, 2011, and that he does not like to walk dogs. (Tr. 155-56). Defendant further testified that when he visited the

14

apartment he never saw any firearms or controlled substances laying around. (Tr. 158).

## II.   **DISCUSSION**

### A.   **Search of the Apartment**

Defendant argues in his Motions to Suppress that evidence from the search of Apartment L-8 should be suppressed because the search was not consensual and the protective sweep was not justified. In addition, Defendant contends that evidence obtained pursuant to a search warrant of the residence should be suppressed as well because the probable cause for the warrant solely consisted of evidence gained from the initial illegal entry into the apartment. The Government contends in response that Defendant, as an occasional overnight visitor who stored a passport and some photographs in the apartment, does not have the minimal contacts necessary to convey standing to contest the search of apartment L-8.

The Fourth Amendment protects persons against unreasonable searches of their persons and houses and thus, bestows personal rights which must be invoked by an individual. U.S. CONST. amend. IV; Minnesota v. Carter, 525 U.S. 83, 88 (1998); Katz v. United States, 389 U.S. 347, 351 (1967) (explaining that "the Fourth Amendment protects people, not places"). "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Katz, 389 U.S. at 351; Carter, 525 U.S. at 88; see also United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1990).

15

Lack of ownership in the place searched is not dispositive of whether the Defendant has a reasonable expectation of privacy in the place searched. Chaves, 169 F.3d at 690. Even if a Defendant does not own the property to be searched, he or she may nonetheless have a reasonable expectation of privacy in that place by virtue of his or her relationship with that place. Chaves, 169 F.3d at 690. To that end, the Supreme Court has concluded in Minnesota v. Olson, 495 U.S. 91 (1990) that an overnight guest in a third party's residence has a reasonable expectation of privacy when that residence is searched. Id at 96-100. There, the Supreme Court explained:

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society.
> . . .
> From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings.

Id. at 99. On the other end of the spectrum, one who is merely legitimately on the premises is not entitled to protection. Carter, 525 U.S. at 91.

In this case, the Defendant, however, does not purport to have been an overnight guest on the day of the search. In fact, Defendant does not even contend that he spent the night in the apartment on the night before the search. Instead, Defendant alleges he was an occasional overnight guest[2] of Albear Camerino when he and Albear Camerino

---

[2] Defendant, in his brief, sometimes refers to himself as a "frequent overnight guest." Defendant's testimony, however, was inconsistent and does not establish that he spent the night at apartment L-8 frequently. Defendant states only that he

16

spent time drinking at the apartment after going to nightclubs together. (Tr. 131, 141-42, 145-48, 154). Defendant also testified that the last time that spent the night in the apartment was two nights before the search. (Tr. 131, 141-42, 145-48, 154). Defendant also testified that he visited the apartment "constantly" and that he sometimes visited the apartment during the day without spending the night. (Tr. 131, 145-47). Defendant also both disavowed and admitted being in apartment L-8 on the day of the search. (Tr. 132; Tr2 32-34). Defendant at one point testified that he had been to apartment L-8 to visit Camerino at 4:00 on August 23, 2011, prior to the time that the search occurred and had left his phone charging in the living room of the apartment. (Tr2 32-34). Defendant further testified that Camerino stored some documents for him, some photographs (depicted in Exhibits 39 - 43), and an iPhone in the apartment. (Tr. 132-33).

Given that Defendant had not spent the night at the apartment even on the day before the search and only stored a few items in the apartment, Defendant's purported tenuous connection with the apartment does not evoke the concerns espoused in Minnesota v. Olson, *supra*, and does not give rise to a reasonable expectation of privacy in the apartment two days later. Unlike the defendant in Minnesota v. Olson, *supra*,

---

sometimes spent the night at the apartment after he and Camerino would drink together there after going to a Mexican nightclub. (Tr. 131, 141-42, 148, 154). Thus, Defendant's statements do not establish whether the times he spent the night in the apartment could accurately be categorized as frequent. A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. United States v. Cooper, 203 F.3d 1279, 1284 (11th Cir. 2000). The Court need not act upon general or conclusory assertions. Cooper, 203 F.3d at 1284. Nor can general or conclusory assertions establish the defendant's standing to contest a search. Cooper, 203 F.3d at 1284.

17

Defendant was not seeking shelter in an undisturbed location on the day of the search, but at best, was a mere visitor who had left prior to the time the search occurred. Important to the inquiry of whether the defendant's expectation of privacy is reasonable is whether the defendant has demonstrated a significant and current interest in the property at the time it was searched. United States v. Bushay, 859 F. Supp. 2d 1335, 1349-50 (N.D. Ga. 2012), citing United States v. Garcia, 741 F.2d 363, 366 (11th Cir. 1984) (holding that mere presence in an apartment is not sufficient to confer standing and that occupant who was not the owner or lessee of the apartment must demonstrate a significant and current interest in the searched premises in order to establish an expectation of privacy); see also United States v. Son, No. 1:12-CR-42-ODE-JFK, 2012 WL 4711978, at *8 (N.D. Ga. Oct. 2, 2012).  Defendant's alleged interest in the premises as an occasional houseguest or a mere visitor on the day of the search and as a place to store a small number of items, was neither significant, nor current. Compare United States v. Jones, 184 F. App'x 943, 945 (11th Cir. 2006) (finding defendant, who inconsistently claimed he lived at residence "from 'time to time' " and stored personal effects there, had no subjective expectation of privacy in residence because he also denied living there and told officers he did not have authority to consent to its search); United States v. Sweeting, 933 F.2d 962, 964 (11th Cir. 1991) (defendants failed to establish standing in residence where they maintained that residence was rented by their mother as a residence for their grandmother even though they had temporary access along with other members of the family and had some personal effects there); Son, 2012

18

WL 4711978, at *8 (holding that defendant who stayed in room searched at residence on occasion when he was visiting his son but was not at the residence at the time it was searched failed to establish expectation of privacy because he did not show any facts about how often he visited, how long he stayed when he visited, or even when he had visited last); United States v. Lisbon, 835 F. Supp. 2d 1329, 1341 (N.D. Ga. 2011) (no reasonable expectation of privacy in father's residence where defendant kept belongings and his vehicle); United States v. Perry, No. 8:09-CR-78-T-33EAJ, 2009 WL 1952778, at *7 (M.D. Fla. July 6, 2009) (defendant who occasionally "crashed" at the residence and stored a couch at the residence did not have reasonable expectation of privacy), aff'd United States v. Perry, 379 F. App'x 888, 895 (11th Cir. 2010); with United States v. Sangineto–Miranda, 859 F.2d 1501, 1510 (6th Cir. 1988) (finding that individual who had key to apartment, was afforded unrestricted access, kept clothes in the apartment and stayed there at least eight times in a one-month period had an expectation of privacy); United States v. Henry, No. 1:09-CR-522-1-TCB, 2010 WL 5559207, at *5 (N.D. Ga. Dec. 7, 2010) (defendant who sometimes slept at home, kept personal possessions at the house, occupied a room at the house, and received mail at house had standing to contest search); United States v. Estrada, No. 1:06-CR-358-RWS-ECS, 2010 WL 6434088, at *2 n.2 (N.D. Ga. Aug. 2, 2010) (holding that defendant who had keys to residence, was regularly an overnight guest, contributed to the rent, and kept personal items in residence had standing to contest search); U.S. v. Bellamy, No. 8:10-CR-58-T-23TBM, 2010 WL 3610437, at *4-5 (M.D. Fla. June 16, 2010) (where defendant occasionally

19

stayed at residence and on the day in question he was overnight guest, he had standing to contest the illegal entry and search of the apartment).   Moreover, while the Government's theory of the case ties Defendant closer to Apartment L-8, Defendant cannot rely on the Government's position, contention, or theory to establish standing and must instead prove his expectation of privacy as to a particular place. United States v. Thompson, 171 F. App'x 823, 828 (11th Cir. 2006) (a disclaimer of ownership of interest deprives a defendant of the subjective expectation of privacy necessary to establish standing); Sweeting, 933 F.2d at 964 & n.2 (concluding that defendants who denied any relationship with their mother's residence except access did not have standing to object to the search, despite fact that government established at trial that defendants actually lived at the residence); Bushay, 859 F. Supp. 2d at 1348-49 (Batten, J.); United States v. Chaidez-Ontiveros, No. 1:11-CR-0264-AT-JFK, 2011 WL 7574634, at *6 (N.D. Ga. Oct. 25, 2011). Accordingly, this Court concludes that Defendant, based on the evidence he presented, has not met his burden of showing that he had a reasonable expectation of privacy in apartment L-8. Accordingly, Defendant's Motion to Suppress evidence seized from apartment L-8 should be **DENIED**.

## B.   Defendant's Statements

Defendant Arzate further contends that statements he made to DEA agents during an interview while in handcuffs and being held at Immigration facilities should be suppressed because they were elicited before he was given Miranda warnings and he was coerced by the agents' threats that he was facing "a real prospect of not seeing his

family for twenty years."[3]  In response, the Government contends that Defendant's statements should not be suppressed because SA Aguilar informed Defendant of his Miranda rights and Defendant waived his rights. The Government further contends that Defendant's account of what occurred in the interview room should be disregarded because Defendant was not credible.

The Fifth Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial. U.S. Const. amend. V; Dickerson v. United States, 530 U.S. 428, 433 (2000); Bram v. United States, 168 U.S. 532, 542 (1897). In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court recognized the need to further safeguard the privilege against self-incrimination by requiring that Miranda warnings, or other fully effective means, be given to subjects of custodial interrogations. Miranda, 384 U.S. at 478-79; see also Dickerson, 530 U.S. at 442-43 (rejecting Congress's attempt through 18 U.S.C. § 3501 to reinstate the totality test as sufficient). The "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). A defendant may waive his Miranda rights "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384

---

[3] Defendant originally argued that during his transport from the DeKalb County Jail to the Homeland Security Office on Spring Street and prior to receiving any Miranda warnings, he was questioned about his involvement with the drugs found at apartment L-8. Defendant, however, never perfected this argument in his post-hearing brief. (Compare Docket Entry 38 with Docket Entry 62). In addition, the Government states that it has no record of any alleged statements made by Defendant during the transport and does not intend to introduce any such statements during trial.

U.S. at 444.  The waiver inquiry is two-pronged.  "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  Moran v. Burbine, 475 U.S. 412, 421 (1986).  "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."  N.C. v. Butler, 441 U.S. 369, 373 (1979); see also United States v. Beckles, 565 F.3d 832, 840 (11th Cir. 2009) (same).

In this case, Defendant freely waived his Miranda rights and made statements with full knowledge of the rights he was waiving for a number of reasons.  First, this Court finds that when Defendant waived his rights, Defendant was aware of the nature of the rights being abandoned and the consequences of the decision to abandon those rights.  SA Aguilar fully apprized Defendant of his rights before he started Defendant's interrogation.  Prior to the interrogation, SA Aguilar read Defendant his Miranda rights in Spanish and allowed him to read along from a card with him.  (Tr. 120-21).  Defendant was notified that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to talk to a lawyer for advice before questioning,  to have a lawyer present during questioning, and that a lawyer could be appointed for him if he could not afford one.  (Tr. 121-22).  Defendant testified that he

was read his rights and responded that he understood his rights "more or less." (Tr. 150). This Court has heard extensive testimony from Defendant and concludes that not only did Defendant have the intellectual capacity to understand his rights, Defendant understood his rights.  While Defendant's testimony at times lacked credibility, it is clear that Defendant is reasonably intelligent and therefore, this Court concludes that he understood his Miranda rights when SA Aguilar read them to him.  SA Aguilar's testimony, which was credible, revealed that Defendant, despite having been apprized of his rights, still agreed to speak with SA Aguilar and was very cooperative. (Tr. 103, 120-22). SA Aguilar also credibly testified that there was no misunderstanding with the Defendant. (Tr. 103).

This Court also rejects Defendant's testimony that he was asked thirty or forty questions before SA Aguilar read Defendant his Miranda rights and credits SA Aguilar's testimony that SA Aguilar read Defendant his rights prior to asking him any questions. (Tr. 122).  The record reflects a lengthy history of Defendant deliberately deceiving governmental authorities and this Court concludes that Defendant's testimony, which includes many inconsistencies and unlikely scenarios, amounts to an attempt to deceive this Court as well.  (Tr2 15-21).

Second, this Court finds that Defendant voluntarily waived his Miranda rights without being subjected to intimidation, coercion, or deception.  Although Defendant testified that SA Aguilar in essence sought to coerce him by making statements about the amount of jail time Defendant faced, this Court credits SA Aguilar's testimony that

23

no such statements were made to Defendant. (Tr. 123, 138). Furthermore, even if this Court credits Defendant's testimony that he was in handcuffs during the interview, it does not follow that Defendant was coerced into testifying by the presence of handcuffs. This Court's observation of Defendant during his evidentiary hearing indicates is not meek and easily coerced. During the evidentiary hearing, Defendant constantly sparred with the prosecutor regarding the prosecutor's questions throughout the prosecutor's cross-examination. (See, e.g., Tr. 139-41, 143-44, 147-49, 151, 158). Given the Defendant's strong personality, this Court cannot conclude that the presence of handcuffs caused Defendant to be coerced into waiving his rights and giving incriminating statements. There is simply no credible evidence that the law enforcement actions during the course of the interview were intimidating, coercive, or deceiving. Under the totality of the circumstances, this Court concludes that Defendant knowingly, intelligently, and voluntarily waived his Miranda rights and provided statements to SA Aguilar.   Accordingly, Defendant's Motion to Suppress his Statements should be **DENIED**.

**DEFENDANT'S MOTION FOR DISMISSAL BASED ON INCORRECT IDENTITY OF DEFENDANT**

In Defendant's Motion for Dismissal Based on Incorrect Identity of Defendant, Defendant argues the indictment against him should be dismissed because the Government cannot meet its burden of proving that the individual Officer Hooks spoke with on the day of the search was Defendant. Specifically, Defendant contends that Albear Camerino, who Defendant alleges is a separate person and the owner of

24

Apartment L-8, was walking the dog on the day of the search and not Defendant.  In support, Defendant points out that that Officer Hooks stopped the man walking the dog, obtained his Mexican identification, wrote his name down as Albear Camerino, and interacted with him for five minutes, but could not affirm that the man walking the dog was Defendant.  Moreover, Defendant also points out that Officer Hooks cannot confirm that the individual who identified himself as Camerino had any tattoos or any other distinctive features.  According to Defendant, Camerino is a different person, who is taller, darker-skinned, and younger than Defendant and has no tattoos.  In response, the Government argues that there is no basis for dismissal of the Indictment because there is no rule that provides for pretrial determination of the Government's evidence, but even if there was, the Government has presented sufficient evidence that Defendant was the individual who committed the crimes for which he was indicted.

This Court agrees with the Government.  It is well-established that the sufficiency of a criminal indictment is determined from its face.  United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006).  For an indictment to be valid, it must contain the elements of the offense intended to be charged, and sufficiently apprise the defendant of what he must be prepared to meet.  Id.  Thus, it is also well-settled that a court may not dismiss an indictment based on the overall sufficiency of the evidence in support of the charges against the Defendant.  Sharpe, 438 F.3d at 1263; United States v. Hawkins, 765 F.2d 1482, 1488 (11th Cir. 1985) ("An indictment valid on its face cannot be challenged merely because the grand jury acted on inadequate or incompetent evidence."); United

25

States v. Hyder, 732 F.2d 841, 844 (11th Cir. 1984) (explaining that if indictments were held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the result would be extreme delays in the progression of the case because before the trial on the merits a defendant could always insist on kind of a preliminary trial to determine the competency and adequacy of the evidence before the grand jury). In this case, Defendant does not argue that either the Indictment or the Superceding Indictment is invalid on its face. Instead, Defendant only argues the Indictment should be dismissed because the evidence possessed by the Government is insufficient to show that he was guilty of the offenses for which he was charged because the Government misidentified him. Accordingly, Defendant's Motion for dismissal of the Indictment based on the incorrect identity of Defendant should be **DENIED**. See, e.g., Hawkins, 765 F.2d at 1488 (refusing to dismiss indictment on the ground that insufficient evidence was presented to grand jury because an indictment valid on its fact cannot be challenged merely because the grand jury acted on inadequate or incompetent evidence); United States v. Ressler. No. 1:06-CR-103-1-TWT, 2007 WL 602210, at *4 (N.D. Ga. Feb. 16, 2007) (rejecting defendant's argument that counts of the indictment should be dismissed because the grand jury could not have legitimately found one of the essential elements of the statutes charged, that is that the goods were counterfeited, when the Government did not have any of the counterfeit goods to present to the grand jury, because it is inappropriate for the district court to exercise its supervisory power to dismiss an indictment that is facially valid on the ground that the grand jury acted on

26

AO 72A
(Rev.8/82)

the basis of inadequate or incompetent evidence); <u>United States v. Al-Arian</u>, 308 F. Supp. 2d 1322, 1354 (M.D. Fla. 2004) (rejecting defendant's argument that counts of the indictment should be dismissed due to misidentification of defendant because nothing in the record showed that misidentification resulted from prosecutorial misconduct and the Eleventh Circuit has repeatedly held that the court may not dismiss an indictment despite mistaken testimony presented to a grand jury).

## CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress Statements of Defendant, Motion to Suppress Evidence, Supplemental Submission Regarding Motion Challenging Identity, and Motion for Dismissal Based on Incorrect Identity of the Defendant should be **DENIED**. Docket Entries [38, 39, 77, 105].

**SO ORDERED, REPORTED AND RECOMMENDED** this ___10___ day of March, 2014.

s/LINDA T. WALKER
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)